424 N.E.2d 1024 (1981)
INDIANA STATE HIGHWAY COMMISSION, Appellant (Petitioner below),
v.
INDIANA CIVIL RIGHTS COMMISSION AND RITA DUNCAN, Appellees (Respondents below).
No. 2-1280A409.
Court of Appeals of Indiana, Second District.
August 13, 1981.
Rehearing Denied October 21, 1981.
*1025 Linley E. Pearson, Atty. Gen., Frederick N. Kopec, Deputy Atty. Gen., Indianapolis, for appellant.
John H. Pleuss, Indianapolis, Alice M. Craft, Indianapolis, for appellee.
BUCHANAN, Chief Judge.

CASE SUMMARY
The Indiana Civil Rights Commission (Civil Rights Commission) found that the Indiana State Highway Commission (Highway Commission) had discriminated against Rita Duncan (Duncan) on the basis of sex, and awarded Duncan $5,312 in lost salary. From an affirmance of this award by the Marion Superior Court, the Highway Commission appeals, asserting that the Civil Rights Commission has no jurisdiction over State agencies, and that the Civil Rights Commission's findings and award were not supported by sufficient evidence.
We affirm.

FACTS
The dramatis personae of this case were all employed by the Indiana State Highway Commission at one time or another in 1976. The work of the highway commission is divided among seven divisions or offices in Indianapolis, along with six local district offices. The Division of Personnel, in Indianapolis, was headed by Thomas S. Williams. The Division of Land Acquisition operated under its chief, John W. Brossart (Brossart), and his deputy William H. Belky (Belky). The Division of Land Acquisition is further divided into seven sections; all but one of these sections, the Administration Section, were directly involved in the acquisition of land for the Highway Commission. It appears that the function of the Administration Section was entirely that of supporting the activities of the remainder of the division.
The chief of the Administration Section at the beginning of 1976 was Samuel Cline (Cline), who was succeeded during the year by Donald E. Christy (Christy). Their secretary was Suzanne Merry.
Donald McCollum, classified as an Administrative Assistant V, reported directly to the chief of the Administration Section. His job was to oversee personnel records for the Division of Land Acquisition, and to verify travel vouchers and payrolls. Rita Duncan often assisted McCollum. She was classified as a "Duplicating Machine Operator VI;" by the letter of her job description, Duncan's sole duties were to operate, and assist others in operating, a photocopy machine. In fact, she additionally did typing, filing, compiling information requested by the Attorney General's office, and assisting McCollum in preparing reports. Duncan started work on July 28, 1975.
Early in 1976, McCollum decided to leave his post, and so the land acquisition division filed a personnel requisition with the Personnel Division for an Administrative Assistant V. The requisition summarized the requirements for the job as "Must have administrative experience and ability. College graduate desirable or the equivalence [sic] in experience." The job description for Administrative Assistant V to the Section of Administration, Division of Land Acquisition, states the requirements for the position more formally:
 Broad knowledge of operational structure of the Division of Land Acquisition.
 Specialized knowledge in accounting procedures.
 Working knowledge of department and agency guidelines.
 Ability to relate to and communicate with people.
After receiving applications, the Division of Personnel forwarded the names of five applicants to the Division of Land Acquisition. Of these, three, including Duncan, were women already employed by the Highway Commission. The remaining two, both men, were not then employed by the Highway Commission. It was to be the duty of the Chief of Land Acquisition, Brossart, to select one of applicants and recommend hiring that applicant to the Chief of Personnel. Between them, Cline and Christy, as chiefs *1026 of the Administration Section, interviewed all applicants. They recommended to Belky, the Assistant Chief of the Division, either Duncan, Patrick Wood, or Suzanne Merry, their secretary, for the job. Since Merry had not submitted an application to the personnel division, she was not then qualified for the job. Additionally, Belky himself interviewed the two male applicants, but not the three female applicants for the job. Duncan had tried to get an interview with Belky or Brossart, but was refused an appointment.
As a result of this process, Brossart recommended that Patrick Wood be hired. Wood had a B.S. Degree in Business Administration, with some emphasis in real estate. While in college, he had held a research assistantship involving the use of a computer. He had held jobs as a bus boy, a research assistant, a warehouse employee, a house painter, and a retail salesman. During his interview with Belky, it developed that Woods' father, a real estate appraiser, was an acquaintance of Belky's.
Rita Duncan holds a Bachelor of Science Degree in Education, had worked for six months assisting McCollum, and had previously worked as a bookkeeping clerk for a bank. It was necessary in that position to be familiar with accounting procedures, and the bank's computerized record-keeping procedures.
During the investigation of Duncan's civil rights complaint, Brossart, Belky, and Christy asserted that they chose Wood because an applicant with an educational background in real estate, business administration, and the use of computers would be better qualified. The Administration Section of the Division of Land Acquisition has no dealings in real estate, and these additional qualifications were never published until after Wood was hired and the complaint was filed.
Duncan filed her complaint with the Civil Rights Commission on April 29, 1976. On June 9, after six weeks of service, Wood resigned his position. He was replaced by a woman, Suzanne Merry. Merry, a three-year employee of the Highway Commission, has no college degree, no experience in real estate, and no significant exposure to computer technology.
On the basis of this evidence, the Civil Rights Commission's hearing officer proposed the following conclusions of law and order:
CONCLUSIONS OF LAW
1. The Commission has jurisdiction over the subject matter and the parties.
2. The complaint was timely filed.
3. Highway Commission is a "person" as that term is defined in I.C. 22-9-1-3(a).
4. Highway Commission is an "employer" as that term is defined in I.C. 22-9-1-3(h).
5. Highway Commission committed a "discriminatory practice" as that term is defined in I.C. 22-9-1-3(1) in that it excluded Duncan from equal opportunities because of her sex by treating male and female applicants in a non-uniform manner during the selection and interviewing process.
6. Highway Commission committed a "discriminatory practice" as that term is defined in I.C. XX-X-X-X-X(1) in that Duncan has shown the following (see McDonnell Douglas Corp. v. Green, 411 U.S. 792, [93 S.Ct. 1817, 36 L.Ed.2d 668] 5 FEP 965 (1973):
a. She is a female.
b. She applied and was qualified for a position for which Highway Commission was seeking applicants.
c. Despite her qualifications, she was rejected for the position.
d. A less qualified male was selected for the position.
e. Respondent's stated reasons for the interviews given male applicants but not female applicants and for selecting a male are in fact pretextual.
7. As a result of discriminatory treatment of Duncan by Highway Commission, Duncan lost salary in the amount of Five Thousand Three Hundred Twelve Dollars ($5,312.00).

*1027 8. Any Finding of Fact which should have been deemed to be a Conclusion of Law is hereby adopted as such.
ORDER
1. Highway Commission shall cease and desist from excluding females from equal opportunities because of sex by processing applications of males differently than those of females and by selecting less qualified males to fill vacant positions.
2. Highway Commission shall pay to Duncan Five Thousand Three Hundred Twelve Dollars ($5,312.00) within thirty (30) days of receipt of notice that a majority of the Commission has approved this Order.
 s/s R. Davy Eaglesfield, III
 R. Davy Eaglesfield, III
 Hearing Officer
 Dated: Aug. 15, 1979
No objections were filed to the recommended findings and conclusions, and the Indiana Civil Rights Commission adopted the recommendations on October 19, 1979. The State Highway Commission filed its petition for judicial review in the Marion County Superior Court on November 5. The court handed down its affirmance of the Civil Rights Commission's order on July 10, 1980. The Highway Commission then perfected this appeal.

ISSUES
The Highway Commission presents two issues:[1]
1. Does the Indiana Civil Rights Commission have jurisdiction to issue cease and desist orders against the Indiana State Highway Commission, a State agency?
2. Was the cease and desist order supported by substantial evidence?

I.

ISSUE ONE  Does the Indiana Civil Rights Commission have jurisdiction to issue cease and desist orders against the Indiana State Highway Commission, a State agency?
PARTIES' CONTENTIONS  The Highway Commission urges that because it is a State agency, it is entitled to a presumption of sovereign immunity from the operation of the Indiana Civil Rights Law, I.C. 22-9-1-1, et seq., unless the act should explicitly provide otherwise. The Highway Commission points out that the Civil Rights Commission is empowered to serve cease and desist orders only upon "persons." I.C. 22-9-1-6(k)(1). While the definitions in section 3 of the act, I.C. 22-9-1-3, indicate that the State and its agencies may be "employers," they are not listed as "persons."[2] The Highway Commission further notes that it and the Civil Rights Commission are called upon by statute to cooperate in fulfilling the Civil Rights Commission's mission of education and enforcement. I.C. 22-9-1-6(d). The legislature could not have intended that State agencies, which are to be on cooperative terms with the Civil Rights Commission, should be placed in the antagonistic position of being subject to the Civil Rights Commission's jurisdiction.
The Civil Rights Commission responds that sovereign immunity no longer has a place in statutory construction; a law for the general good should apply to the State unless the State is excluded. The Civil Rights Law fairly includes the State in its language, and this construction should be *1028 favored as furthering the purpose of the act. Such a construction, in the Civil Rights Commission's view, also avoids potential contradictions and absurdities in the act.
CONCLUSION  State agencies are subject to the jurisdiction of the Indiana Civil Rights Commission.
The key to the coverage of the Civil Rights Law is contained in certain parts of that law:
22-9-1-2 Public policy; construction of chapter

Sec. 2. (a) It is the public policy of the state of Indiana to provide all of its citizens equal opportunity for education, employment, access to public conveniences and accommodations and acquisition through purchase or rental of real property including but not limited to housing, and to eliminate segregation or separation based solely on race, religion, color, sex, handicap, national origin or ancestry, since such segregation is an impediment to equal opportunity. Equal education and employment opportunities and equal access to and use of public accommodations and equal opportunity for acquisition of real property are hereby declared to be civil rights.
(b) The practice of denying these rights to properly qualified persons by reason of the race, religion, color, sex, handicap, national origin or ancestry of such person is contrary to the principles of freedom and equality of opportunity and is a burden to the objectives of the public policy of this state and shall be considered as discriminatory practices. The promotion of equal opportunity without regard to race, religion, color, sex, handicap, national origin or ancestry through reasonable methods is the purpose of this chapter.
(c) It is also the public policy of this state to protect employers, labor organizations, employment agencies, property owners, real estate brokers, builders and lending institutions from unfounded charges of discrimination.
(d) It is hereby declared to be contrary to the public policy of the state of Indiana and an unlawful practice for any person, for profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, religion, color, sex, handicap, national origin or ancestry.
(e) This chapter shall be construed broadly to effectuate its purpose.
22-9-1-3 Definitions

Sec. 3. As used in this chapter: (a) The term "person" means one (1) or more individuals, partnerships, associations, organizations, corporations, labor organizations, cooperatives, legal representatives, trustees, trustees in bankruptcy, receivers and other organized groups of persons.

* * * * * *
(h) The term "employer" means the state, or any political or civil subdivision thereof, and any person employing six (6) or more persons within the state; except that the term "employer" does not include any not-for-profit corporation or association organized exclusively for fraternal or religious purposes, nor any school, educational or charitable religious institution owned or conducted by, or affiliated with, a church or religious institution, nor any exclusively social club, corporation or association that is not organized for profit.
* * * * * *
(l) The term "discriminatory practice" means the exclusion of a person, from equal opportunities because of race, religion, color, sex, handicap, national origin or ancestry; or a system which excludes persons from equal opportunities because of race, religion, color, sex, handicap, national origin or ancestry; or the promotion of racial segregation or separation in any manner, including but not limited to, the inducing of, or the attempting to induce, for profit, any person to sell or rent any dwelling by representations regarding the entry or prospective entry in the neighborhood of a person or persons *1029 of a particular race, religion, color, sex, handicap, national origin or ancestry. Every discriminatory practice relating to the acquisition or sale of real estate, education, public accommodations, employment, or the extending of credit as "credit" is defined in I.C. 24-4.5-1-301, shall be considered unlawful unless it is specifically exempted by this chapter.
* * * * * *
(p) The term "sex" as it applies to segregation or separation in this chapter applies to all types of employment, education, public accommodations and housing: Provided, however, that (1) it shall not be a discriminatory practice to maintain separate rest rooms; and that (2) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor management committee controlling apprenticeship or other training or retraining programs to admit or employ any other individual in any such program on the basis of sex in those certain instances where sex is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise; and that (3) it shall not be a discriminatory practice for a private or religious educational institution to continue to maintain and enforce a policy of admitting students of one sex only.
* * * * * *
22-9-1-6 Civil rights commission; powers and duties

Sec. 6. The commission shall have the following powers and duties:
* * * * * *
(d) To formulate policies to effectuate the purposes of this chapter and make recommendations to agencies and officers of the state or local subdivisions thereof to effectuate such policies. The several departments, commissions, divisions, authorities, boards, bureaus, agencies and officers of the state or any political subdivision or agency thereof shall furnish the commission, upon its request, all records, papers, and information in their possession relating to any matter before the commission.
(e) To receive and investigate complaints alleging discriminatory practices. The commission shall not hold hearings in the absence of a complaint. All investigations of complaints shall be conducted by staff members of the Indiana Civil Rights Commission or their agents.
* * * * * *
(k)(1) To state its findings of fact after a hearing and, if the commission finds a person has engaged in an unlawful discriminatory practice, it may cause to be served on such person an order requiring such person to cease and desist from the unlawful discriminatory practice and requiring such person to take further affirmative action as will effectuate the purposes of this chapter, including but not limited to the power to restore complainant's losses incurred as a result of discriminatory treatment, as the commission may deem necessary to assure justice, Provided, however, that this specific provision when applied to orders pertaining to employment shall include only wages, salary or commissions; to require the posting of notice setting forth the public policy of Indiana concerning civil rights and respondent's compliance with said policy in places of public accommodations; to require proof of compliance to be filed by respondent at periodic intervals; to require a person who has been found to be in violation of the Indiana Civil Rights Law, and who is licensed by a state agency authorized to grant a license, to show cause to the licensing agency why his license should not be revoked or suspended.
* * * * * *
(Emphasis added)
I.C. 1-1-4-1(1) requires that, "unless such construction is plainly repugnant *1030 to the intent of the legislature or of the context of the same statute: ... Words and phrases shall be taken in their plain, or ordinary and usual, sense." State v. Bress, (1976) Ind. App., 349 N.E.2d 229. But the intent of the legislature remains the lodestone of statutory construction. I.C. 1-1-4-1. Whenever the legislature has made its intent clear, and its language leaves no ambiguity to be resolved, we will not construe the statute. Glick v. Department of Commerce, (1979) Ind. App., 387 N.E.2d 74; Bowen v. Review Board of Indiana Employment Security Division, (1977) Ind. App., 362 N.E.2d 1178.
This statute does require construction, however. It authorizes cease and desist orders against "persons," a term which it defines in a manner that does not explicitly include the State or its agencies, but does include "other organized groups of persons." I.C. 22-9-1-3(a). The State, in another part of the Civil Rights Law (I.C. 22-9-1-3(h)) is included as an "employer." So on its face there is ambiguity.
For reasons hereinafter set forth we discern the unmistakable intent of the Legislature to be that the State and its agencies are subject to cease and desist orders of the Civil Rights Commission. This reading of the Indiana Civil Rights Law is consistent with other provisions of the statute, contradicts nothing in the statute, and fulfills the express purpose of the statute.
The Civil Rights Commission issued its order against the Highway Commission under the authority of I.C. 22-9-1-6(k)(1).[3] This remedies section provides that the Commission may serve cease and desist orders upon a "person" who has committed an unlawful discriminatory practice. The Highway Commission's argument turns on its assertion that the State and its agencies are not "persons" within the meaning of the Civil Rights Law.
"Person" is defined in § 3(a) of the Civil Rights Law. I.C. 22-9-1-3(a). The term is defined to include organizations and "other organized groups of persons." The application of this definition to the State Highway Commission is hardly escapable. That the Highway Commission is an organization, or a group of persons acting in an organized fashion, is a matter of law. I.C. 8-13-1-8.
To read the definition of the word "person" as a substantive restriction on the powers of the Commission does not make the Civil Rights Law a more effective, consistent, or sensible statute. The State would still be subject to most of the remaining powers of the Commission. The Commission would still be able to "receive and investigate complaints alleging discriminatory practices" against the State. I.C. 22-9-1-6(e). It may appoint special agencies and councils to investigate discriminatory practices by the State. I.C. 22-9-1-6(f). It would retain powers of discovery against the State and its agencies far greater than any it has against private persons. I.C. 22-9-1-6(d). It could issue subpoenas against State officials under pain of contempt. I.C. 22-9-1-6(j)(1).
Taking the word "person" as a term of art for purposes of the Civil Rights Law, as the Highway Commission urges, does not appear to serve any legislative purpose. We believe that if the Legislature had intended to save the State from trouble and expense, it would not have left the State exposed to most of the trouble and expense that the statute could engender. Adopting the Highway Commission's restrictive view of the word "person" reveals to us no compelling and consistent scheme to indicate that such a reading suits the Legislature's intent.
Section 3(h) of the Civil Rights Law includes the State and its political and civil subdivisions in the term "employer."[4] The *1031 use of the term "employer" in the Civil Rights Law shows that the Legislature expected that the State would be subject to the enforcement authority of the Civil Rights Commission.
In Section 3(p)(2) of the Act, we read that "it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of sex in those certain instances where sex is a bona fide occupational qualification... ." I.C. 22-9-1-3(p)(2). Section 13 of the Act provides that it shall not be a discriminatory employment practice for an employer: to fail to employ a handicapped person who is unable to perform the duties of his job; to promote or transfer a handicapped person to a job for which he is not qualified; or to fail to modify structures or procedures to accommodate a handicapped person. I.C. XX-X-X-XX. These provisions exempt the State and its agencies from cease and desist orders under certain circumstances. These exemptions would be surplusage if the State were not subject to cease and desist orders in the first place; and we will avoid reducing statutory language to surplusage whenever possible. Kidwell v. State, (1967) 249 Ind. 430, 230 N.E.2d 590; Evansville Vanderburgh County Department of Health v. Evansville Printing Corp., (1975) 165 Ind. App. 437, 332 N.E.2d 829.
Additionally, we note that Section 3(p) of the Civil Rights Law says that "[t]he term `sex' as it applies to segregation or separation in this chapter applies to all types of employment ... ." I.C. 22-9-1-3(p) (emphasis added).
Once again, given a ready chance to employ the phrase "Private employment," "non-public employment," or "employment, except by the State or its agencies," the Legislature took no effort to exempt the State, but applied its strictures against sex discrimination to "all types of employment." To exempt public employment from that language would ignore the plain meaning of the statute and reduce the words of the Legislature to posturing and surplusage.[5] This we must not do. I.C. 1-1-4-1; Kidwell, supra.
It is admittedly possible to contrive a reading of the Civil Rights Law that forbids cease and desist orders against the State, and does not reduce its substantive provisions to self-contradiction. Even if such an alternative reading were of equal weight, the public policy proclaimed in Section 2 of the Act would still lead us to decide that the State must be subject to the enforcement provisions of the Act. I.C. 22-9-1-2.
Section 2 does not say that the upholding of civil rights is a thing to be admired only in others. Instead, it declares that "[i]t is the public policy of the State of Indiana to provide all of its citizens equal opportunity for ... employment...." I.C. 22-9-1-2(a). The State has thus undertaken not merely to enforce, but affirmatively to provide equal employment opportunity for all citizens of Indiana. This language applies to citizens who are employed by the State no less than to any others. The right to equal employment opportunity is declared a civil right, the denial of which "to properly qualified persons by reason of ... sex ... is a burden to the objectives of the public policy of this State... ." I.C. 22-9-1-2(b). The State of Indiana has spoken its sovereign will in these words. It has renounced discrimination for itself, and condemned every instance of discrimination  public or private  as defeating its policy.
If the State's undertaking to provide equal employment opportunities can be said to leave us in any doubt as to the intent of the Legislature, then Section 2(e) of the Act tells us how that doubt should be resolved: "This chapter shall be construed broadly to effectuate its purpose." I.C. 22-9-1-2(e). We are to resolve all ambiguities in the statute, including whether the State is included *1032 in the term "person," by choosing the answer which best effects the purpose of the Civil Rights Law. It is apparent to us that if State employees do not enjoy the full protection of the Civil Rights Law, then the Legislature's intention that all citizens of Indiana be provided with equal employment opportunities will be defeated. Since the statute may fairly be read to avoid such a result, we are bound to do so. I.C. 22-9-1-2(e).
Against all of this, the Highway Commission argues as a general principle of statutory construction that statutes of general application do not ordinarily bind States, unless the statute explicitly provides otherwise. Carr v. State ex rel. duCoetlosquet, (1891) 127 Ind. 204, 26 N.E. 778; see also Wisconsin ex rel. Department of Public Instruction v. Department of Industry, Labor and Human Relations, (1975) 68 Wis.2d 677, 229 N.W.2d 591.
[This] presumption is an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated.
United States v. California (1936), 297 U.S. 175, 186, 56 S.Ct. 421, 425, 80 L.Ed. 567: accord, I.C. 1-1-4-1.
The old presumption against applying general statutes to the State has been further weakened by the decline of the common law doctrine of sovereign immunity in Indiana. Campbell v. State (1972), 259 Ind. 55, 284 N.E.2d 733. "The existence and application of the doctrine of sovereign immunity is a judicial question." Id., 284 N.E.2d at 737. The same is true of the rule the Highway Commission sponsors before us: it is a judicial rule of construction, the fate of which is linked to the vitality of sovereign immunity.
The Campbell court has given us a test to determine whether an action could lie against the State: "[I]n order for one to have standing to recover in a suit against the State there must have been a breach of duty owed to a private individual." Id. The Civil Rights Law itself makes it clear that discriminatory hiring practices do breach a duty of the State to its individual citizens. The logic of the law today does not support the use of sovereign immunity to bring the State outside a statute, when the statute strongly implies otherwise.
In any event, we cannot see how sovereign immunity could be applied to the case at bar. Discriminatory practices are not acts of the sovereign will; by statute, they defy the sovereign will. I.C. 22-9-1-2(b). The Civil Rights Commission is no interloper, obstructing the conduct of the public business; by statute, it conducts the public business itself by enforcing the declared public policy of the State, a policy the Highway Commission itself is bound to foster. Id.; I.C. 22-9-1-6(d), (m).
By way of analogy, the Highway Commission cites us to cases which stand for the rule that States and their agencies are not "persons" within the meaning of the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983. E.g. Ligon v. Maryland (D.Md. 1977), 448 F. Supp. 935. Tracing these cases leads us back to Monroe v. Pape (1961), 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, which established the immunity of municipalities from § 1983. The Court made an extensive survey of the debates on § 1983 and from the legislative history concluded that municipalities were meant to be excluded. 365 U.S. at 190-91, 81 S.Ct. at 485-486. Other Federal courts derived the principle of State immunity from § 1983 from Monroe. E.g. Sires v. Cole (1963), 9th Cir., 320 F.2d 877.
States were excluded from the word "person" under § 1983 in deference to the unmistakable desire of the drafters that it should be so. Our own legislature, in drafting the Civil Rights Law, has given us no such sign. We cannot conclude from the unique interpretation given § 1983 that "person," as defined in the Indiana Civil Rights Law, must exclude the State.
Next, the Highway Commission recites the various provisions of the Civil Rights Law that call on the Civil Rights Commission and other State agencies to cooperate in promoting the aims of the act. I.C. *1033 22-9-1-6(d), (m). "It is clear," says the Highway Commission, "that ... the legislature intended that the various State agencies work together with the commission and not in an adversary context in order to promote the cause of civil rights." This requirement of cooperation is no different from what the law requires of every citizen. The law does not purchase the citizen's cooperation by exempting him from arrest, and we do not believe that the legislature intended to purchase the Highway Commission's cooperation at the expense of enforcing the Civil Rights Law.
Finally, the Highway Commission points to the definitions of "employer" and "person" found in section three of the Civil Rights Act,[6] which mention the State and its agencies as potential employers but not as persons. From this disparity the Highway Commission adduces that if the legislature had intended to make the State and its agencies subject to cease and desist orders, it could easily have done so either by including them in the word "person", or by including the word "employer" in the enabling section.
So far as its statement of a rule of statutory construction goes, the Highway Commission is correct. But the technical rules of construction must give way to the preeminent principle that statutes must not be read so as to defeat the intent of the legislature. I.C. 1-1-4-1; Pryor v. State, (1973) 260 Ind. 408, 296 N.E.2d 125. "Also, it is well established that in giving the statutory language its plain and ordinary meaning ... we should not so construe a statute as to willfully and unnecessarily narrow or emasculate its provisions. Bohannan v. Bohannan (1961), 132 Ind. App. 504, 167 N.E.2d 717, trans. den." White v. White (1975), 167 Ind. App. 459, 338 N.E.2d 749.
The Highway Commission's construction of the Civil Rights Law would, in effect, emasculate that law.
Accordingly, we decide that the Civil Rights Law includes the State of Indiana and its agencies as a "person" subject to its provisions.

II.

ISSUE TWO  Was the cease and desist order supported by substantial evidence?
PARTIES' CONTENTIONS  Relying upon the list of requirements eventually used to justify the hiring of Wood, the Highway Commission contests the Civil Rights Commission's finding that Rita Duncan was better qualified for the Administrative Assistant V position than Patrick Wood. The Highway Commission contends that the only evidence of sex discrimination was the testimony of a Civil Rights Commission investigator who reported that Cline had told him several times that Brossart had instructed Cline to hire a man for the position. Cline was not available to testify at the hearing. The Highway Commission argues that such compound hearsay cannot, without more direct corroboration, form the basis of an administrative order.
The Civil Rights Commission has provided us with a convenient appendix to its brief, consisting of its findings of fact and conclusions of law, annotated with references to the evidence before the commission.
CONCLUSION  The order of the Civil Rights Commission was supported by substantial evidence.
*1034 In reviewing an administrative decision, the courts are limited by section 14 of the Indiana Administrative Adjudication Act[7] which, in the case at bar, essentially confines us to the question of whether the cease and desist order was unsupported by substantial evidence, or can be seen from uncontradicted evidence to be arbitrary and capricious. Department of Financial Institutions v. Colonial Bank and Trust Co. (1978), Ind. App., 375 N.E.2d 285, cert. den'd (1979), 439 U.S. 1166, 99 S.Ct. 1022, 59 L.Ed.2d 75; Department of Financial Institutions v. State Bank of Lizton (1969), 253 Ind. 172, 252 N.E.2d 248. Reviewing courts are to defer to administrative findings of fact, and may not overturn the expert conclusions of the agency merely because the court itself might have drawn different conclusions. Id.
The admission of hearsay before an administrative agency does not give rise to error (or terror) if it is corroborated by a "residuum" of competent evidence. C.T.S. Corp. v. Schoulton (1978), Ind., 383 N.E.2d 293; Carroll v. Knickerbocker Ice Co. (1916), 218 N.Y. 435, 440, 113 N.E. 507, 509. There is in this record evidence other than the hearsay complained-of to support the Findings of the Civil Rights Commission. Further, the hearsay in this case was not preserved for appeal, for no objection was made to it during the hearing. Id., 383 N.E.2d at 297; Hinshaw v. Waddell (1957), 128 Ind. App. 67, 142 N.E.2d 640.
Additionally, the harmless error doctrine applies to judicial review of administrative decisions. Colonial Bank and Trust, supra, Ogilvie v. Review Board of Indiana Employment Security Division (1972), 133 Ind. App. 664, 184 N.E.2d 817.
The testimony of the commission's investigator that Cline had been instructed to hire only a man, if error at all, was harmless error. The substance of the investigator's testimony appears nowhere in the commission's findings of fact or conclusions of law. The finding of a discriminatory practice was clearly based on facts that either appeared on the record or could reasonably be inferred from the record. The Highway Commission's actions during the hiring process plainly show that the women applying for the administrative assistant position were never seriously considered for the job. The qualifications which the Highway Commission presented to show that Wood was better qualified than Duncan could under the circumstances be called pretextual  especially when, in the face of a sex discrimination complaint, the Highway Commission later hired a woman who met none of the additional qualifications.
Thus, there was substantial evidence justifying the conclusion of the Civil Rights Commission that Rita Duncan had suffered a loss as a result of a discriminatory practice.
The decision of the trial court is affirmed.
SULLIVAN and SHIELDS, JJ., concur.
NOTES
[1] Because of our resolution of these issues, we do not reach the Civil Rights Commission's "additional ground for relief," wherein it sought to estop the Highway Commission from seeking judicial review of its order or the ground that the Highway Commission had entered no objection to the recommended findings of fact and conclusions of law before they were adopted by the full commission.
[2] As used in this chapter:

(a) The term "person" means one or more individuals, partnerships, associations, organizations, corporations, labor organizations, cooperatives, legal representatives, trustees, trustees in bankruptcy, receivers and other organized groups of persons. I.C. 22-9-1-3(a)
[3] "[I]f the commission finds a person has engaged in an unlawful discriminatory practice, it may cause to be served on such person an order requiring such person to cease and desist from the unlawful discriminatory practice and requiring such person to take further affirmative action as will effectuate the purposes of this chapter, including but not limited to the power to restore complainant's losses... ." Id.
[4] Section 3(h) also includes many exemptions from the term, suggesting to us that had the Legislature meant to exempt the State from the term "person," it would have expressed that intention by including a specific exemption. I.C. 22-9-1-3(h).
[5] The Legislature could not have forgotten that the State is one of the largest employers in Indiana.
[6] 22-9-1-3 Definitions.  As used in this chapter: (a) The term "person" means one or more individual, partnerships, associations, organizations, corporations, labor organizations, cooperatives, legal representatives, trustees in bankruptcy, receivers and other organized groups of persons.

* * * * * *
(h) The term "employer" means the state, or any political or civil subdivision thereof, and any person employing six or more persons within the state; except that the term "employer" does not include any not-for-profit corporation or association organized exclusively for fraternal or religious purposes, nor any school, educational or charitable religious institution owned or conducted by, or affiliated with, a church or religious institution, nor any exclusively social club, corporation or association that is not organized for profit.
[7] I.C. X-XX-X-XX Judicial review  Courts  Procedure.  Any party or person aggrieved by any order or determination made by any such agency shall be entitled to a judicial review thereof in accordance with the provisions of this act. Such review may be had by filing with the circuit or superior court of the county in which such person resides, or in any county in which such order or determination is to be carried out or enforced, a verified petition setting out such order, decision or determination so made by said agency, and alleging specifically wherein said order, decision or determination is:

(1) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; or
(2) Contrary to constitutional right, power, privilege or immunity; or
(3) In excess of statutory jurisdiction, authority or limitations, or short of statutory right; or
(4) Without observance of procedure required by law; or
(5) Unsupported by substantial evidence.